## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| MADELINE MARIE MARVICH, | CASE NO. 4:23-CV-00833-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OF OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff Madeline M. Marvich challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On June 16, 2023, the parties consented to my exercising jurisdiction pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #10). Following review, and for the reasons stated below, I **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings consistent with this opinion.

### PROCEDURAL BACKGROUND

Ms. Marvich filed for DIB and SSI in April 2021, alleging a disability onset date of December 29, 2020. (Tr. 246, 253). After her claims were denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge. (Tr. 97-114, 117-38, 167-69). Ms. Marvich (represented by counsel) and a vocational expert (VE) testified before the ALJ on June 15, 2022. (Tr. 35-63).

1

On June 28, 2022, the ALJ found Ms. Marvich not disabled. (Tr. 12-34). The Appeals Council denied Ms. Marvich's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481). Ms. Marvich timely filed this action on April 20, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.     Personal and Vocational Evidence

Ms. Marvich was 32 years old on her alleged onset date and 34 years old at the administrative hearing. (Tr. 97). After graduating high school, she attended three years of college. (Tr. 274). She has worked as a loan specialist, retail banker, and teller in the banking industry and groomed and trained dogs. (Tr. 41-47, 274).

## II.    Administrative Hearing

At the hearing, counsel for Ms. Marvich stated she has chronic migraines, fibromyalgia, major depressive disorder, vertigo, elevated rheumatoid factor, bilateral hearing loss, and right hip degenerative joint disease. (Tr. 38).

Ms. Marvich is separated and lives with her 7-year-old son, her soon-to-be ex-husband, and his fiancé. (Tr. 40, 51). She lives with others because she cannot take care of herself anymore. (Tr. 51). Ms. Marvich stopped working in December 2020 following an increase in headache and migraine frequency. (Tr. 40-41, 53). She has migraines five to ten times a month and daily headaches. (Tr. 53). For three to five days a week she stays in bed because she feels sick, swollen, and nauseated to the point she cannot function. (Tr. 52). She rates her average pain at 7-8/10 and struggles to focus on anything else. (Tr. 48). For three days before the hearing, Ms. Marvich remained in bed suffering from migraines with vomiting. (*Id.*). Most days, she can hardly move;

2

lying down hurts and she struggles to walk or stand for extended durations. (*Id.*). She endorsed

trying to eat healthy and move more, but she spends a lot of time in bed or on the couch. (Tr. 53).

Ms. Marvich's doctors keep changing her medication regimen "because it helps for a little bit and

then [her] body just gets used to it, just stops working." (*Id.*).

When Ms. Marvich has a migraine, she cannot function at all. (Tr. 54). The pain is so

severe it makes her eyes water and the whole left side of her face and body go numb. (*Id.*). She

experiences associated nausea, vomiting, dizziness, and vertigo and is bothered by smells and

sounds. (*Id.*). When she has a migraine, she locks herself in a dark, quiet place, takes her

medication, and hopes for the best. (*Id.*). Vomiting almost always accompanies her migraines. (*Id.*).

Sometimes, she cannot leave the bathroom for hours. (*Id.*). After the migraine subsides, she usually

feels lightheaded, exhausted, and everything is foggy. (Tr. 55).

She described sporadic, involuntary shaking and a feeling akin to an electric shock running

through her spine. (Tr. 56). She also experiences uncontrolled jerking in her hips and back. (*Id.*).

Initially, this was thought to be a side effect from medication, but the symptoms worsened after

her doctors discontinued that medication. (*Id.*). Ms. Marvich testified she was scheduled for an

upcoming multi-day testing period at the Cleveland Clinic Epilepsy Center to evaluate the

uncontrollable shakes she experiences to determine the presence of seizure activity. (Tr. 49).

Ms. Marvich endorsed issues with memory, concentration, and interacting with others. (Tr.

48). She forgets things constantly, feels overwhelmed by the simplest task and struggles to start,

and gets anxious around other people. (*Id.*). She endorsed easy distractibility ("If there's any

background noise, I'm only partial[ly] listening") and asks people to repeat because she either lost

track of the conversation or did not hear it. (*Id.*).

On a typical day, Ms. Marvich awakens at 7:00 a.m. to help her son make breakfast and see him off to school. (Tr. 51). She helps as much as she can, but her son is independent and can get cleaned up on his own. (*Id.*). Once her son leaves for school, Ms. Marvich is usually exhausted and cannot stay awake; she returns to bed and "crashes" for another three to four hours. (*Id.*). If it is her turn to pick up her son from school, Ms. Marvich drives a few minutes down the street to get him. (*Id.*). Once home, she usually helps him get a snack and tries to help with homework. (*Id.*). Ms. Marvich's ex-husband, the child's father, helps with childcare, as do her parents. (*Id.*). She often misses out on time with her child. (Tr. 48). When she feels "okay," she can, at most, take the dog out and maybe load the dishwasher. (Tr. 51).

Ms. Marvich sees a psychiatrist for medication management and endorsed multiple medication changes. (*Id.*). She finds the treatment helpful. (Tr. 50).

The VE testified that a person of Ms. Marvich's age, education, and experience, with the functional limitations described in the ALJ's RFC determination, could not perform her past relevant work. (Tr. 61). The VE identified light exertion, unskilled positions that the hypothetical person could perform, including information clerk, office helper, and mail clerk. (*Id.*). The VE also testified a person cannot maintain work if off task for more than 15 percent of the workday or absent two or more days a month. (Tr. 60). A person requiring extra breaks during the workday could not maintain competitive employment. (Tr. 62).

## III.    Relevant Medical Evidence

On December 21, 2020, Ms. Marvich met with neurologist Marlene Bednar, M.D., for evaluation of migraine headaches. (Tr. 405). She described a lifelong history of headaches that worsened in the past two years. (Tr. 406). Ms. Marvich described the pain as mostly sharp behind

the left eye, stabbing, pressure, and throbbing. (*Id.*). She reported associated left-sided facial numbness and droop, vertigo, vestibulopathy, occasional tinnitus, nausea, photophobia, and phonophobia. (*Id.*). Ms. Marvich claimed the symptoms occur two times a month and can last a few hours up to a full day. (*Id.*). She is intolerant of sumatriptan drugs but takes carbamazepine twice a day and uses Tylenol, NSAIDs, and Zofran as needed. (*Id.*). She indicated her doctor decreased the dosage of carbamazepine from 100 mg twice a day to 50 mg twice a day to reduce the side effect of fatigue. (Tr. 409). Ms. Marvich also endorsed fatigue, dysphoria, and sleep disturbance. (Tr. 408).

On examination, Dr. Bednar noted mildly reduced attention span and concentration with easy distractibility and moderate anxiety. (Tr. 409). Ms. Marvich reported altered sensation to light touch and sharp stick testing of her left arm, face, and leg compared to her right side. (*Id.*). Otherwise, cranial nerve assessment was normal, and Ms. Marvich displayed full power in her extremities without tremor or drift, normal muscle tone without cogwheeling or spasticity, intact motor function of both hands, and grossly intact coordination. (*Id.*). Dr. Bednar could not assess her fund of knowledge as Ms. Marvich was tangential at the time. (*Id.*). Dr. Bednar assessed Ms. Marvich with migraine with sensory aura, intermittent muscle contraction headaches consistent with mixed headache pain syndrome, chronic peripheral vestibulopathy, and atypical face pain. (*Id.*). Dr. Bednar also noted multiple somatoform symptoms. (*Id.*). She referred Ms. Marvich to an ear, nose, and throat (ENT) physician for evaluation of dizziness, vertigo, and tinnitus, ordered an MRI brain scan, and prescribed amitriptyline for migraine and chronic insomnia. (*Id.*).

On February 2, 2021, the ENT physician found no evidence to indicate any inner ear contribution to her migraines. (Tr. 403).

On February 5, 2021, Ms. Marvich returned to Dr. Bednar's office and reported no facial or ocular pain, but the medication makes her very sleepy during the day. (Tr. 398). She endorsed fatigue, peripheral vertigo, tinnitus, arthralgias, myalgias, dizziness, and lightheadedness. (Tr. 400). Dr. Bednar discontinued amitriptyline and carbamazepine "due to potential for adverse side effects of dizziness, vestibulopathy, fatigue, and cognitive problems [Ms. Marvich was] experiencing." (Tr. 398). Because of her intolerance to triptans, Dr. Bednar recommended meclizine or Benadryl, Advil or Aleve, and Tylenol as needed for headaches and a low dose of propranolol two to three times a day. (*Id.*). Dr. Bednar also recommended treatment with a behavioral health specialist to address somatization symptoms and anxiety/dysthymia. (*Id.*).

On March 2, 2021, Ms. Marvich met with rheumatologist Erin Penn, M.D., for evaluation of multiple symptoms. (Tr. 343-45). She summarized her migraine history and reported she stopped taking amitriptyline and carbamazepine because they made her sleep for 12 to 16 hours at a time. (Tr. 343). She endorsed extreme fatigue, shooting pains down her right leg and arms, generalized diffuse stiffness in her knees, elbows, and shoulders, intermittent sweats and chills, and unexplained weight gain. (*Id.*). On physical examination, Ms. Marvich reported bruise-like pain when Dr. Penn touched her hands, arms, legs, and upper back. (*Id.*). Otherwise, physical and neurological examinations were normal. (Tr. 344). Lab work revealed a moderately elevated rheumatoid factor. (Tr. 345). Dr. Penn felt Ms. Marvich's brain fog, hyperalgesia, diffuse pain, and fatigue were suggestive of fibromyalgia rather than rheumatoid arthritis. (*Id.*). Dr. Penn ordered additional testing to determine if infection caused the positive rheumatoid factor. (*Id.*).

On March 22, 2021, Ms. Marvich met with family physician Steffi D'Souza, M.D., at St. Elizabeth Boardman Health Center to establish care. (Tr. 392-97). She endorsed overall stiffness

and muscle soreness, extreme fatigue, widespread pain, and constantly feeling tired. (Tr. 393). She also reported difficulty accomplishing activities of daily living. (Tr. 393) ("putting in a load of laundry feels like a marathon," she is in bed for two days with widespread pain and fatigue after walking the dog). Her headaches occur throughout the day, vary in severity, and are often accompanied by nausea and vomiting. (*Id.*). Physical examination was normal, but Dr. D'Souza noted Ms. Marvich was depressed and tearful during the appointment. (Tr. 395-96). Dr. D'Souza assessed Ms. Marvich with fibromyalgia and prescribed Cymbalta and urged Ms. Marvich to consult with a psychiatrist for depression. (Tr. 396).

On March 24, 2021, Ms. Marvich attended an initial evaluation at the Neuromuscular Center at the Cleveland Clinic. (Tr. 334-38). Staff physician Li Yuebing, M.D., evaluated Ms. Marvich for "multiple complaints" and to "rule out small fiber neuropathy." (Tr. 334). Ms. Marvich described a history of migraines occurring once or twice a month since age 12 or 13. (*Id.*). In November or December 2020, she experienced daily persistent headaches and three to five migraines a week. (*Id.*). She described morning stiffness for about 10 to 20 minutes, tightness in her right calf and shoulder blade, mid back, and chest, and random trembling and jaw chattering. (Tr. 334-35). She reported variable body temperature, including breaking out into a sweat without reason or feeling sweaty but having cold feet. (Tr. 335). In addition, Ms. Marvich described hand and finger dexterity issues. (*Id.*) ("My hands won't do it. My writing is different. I cannot grab [a] pen sometimes."). Dr. Yuebing noted a normal MRI brain scan from December 2020. (Tr. 334). She was doing "fairly well" in January and February 2021 and experienced only mild, tolerable headaches while taking amitriptyline and carbamazepine. (*Id.*). Her headaches and migraine attacks resumed in March 2021 when Dr. Bednar stopped her medications. (*Id.*). Dr. Yuebing noted: "Her

neurologist has not adjusted her migraine medications and has let her go." (*Id.*). Ms. Marvich reported that since January 2021, she has struggled to find words and feels like she does not know how to talk. (Tr. 335). Since February, she noticed heightened intolerances. (*Id.*) ("Everything feels heightened. Certain smells bother me a lot. Voices sound louder. Light bothers me. It feels too much."). Ms. Marvich also reported migraine-associated face and hand numbness on the left, present for a couple of years but, since February 2021, spreading to both hands and persisting after the migraine subsides. (*Id.*).

Otherwise, she endorsed memory and focus issues, irritability, and leg weakness and trembling after walking two blocks. (*Id.*). Ms. Marvich expressed concern about this because she "used to be in the military" and is "not out of shape." (*Id.*). Physical, mental status, and cranial nerve examinations were normal. (Tr. 336-37). Dr. Yuebing concluded as follows:

> I do not see much evidence for small fiber neuropathy in this case. I feel a lot of symptoms may be explained by her intractable migraine headache and I suspect there is a need for aggressive treatment here. She was just started on Cymbalta yesterday and this is a good option.

(Tr. 338). Dr. Yuebing referred Ms. Marvich to the headache center. (*Id.*).

On March 25, 2021, Ms. Marvich called her doctor's office to report a possible adverse reaction to Cymbalta and described numbness and tingling in her extremities, dizziness, nausea, and vomiting. (Tr. 392). The medical assistant recommended a visit to the emergency department. (*Id.*). At the emergency department, physical examination and work up were normal. (Tr. 387-91). The doctor advised Ms. Marvich to stop Cymbalta and follow up with her primary care physician. (Tr. 390).

On March 26, 2021, Ms. Marvich followed up at St. Elizabeth's and reported the adverse reaction to Cymbalta, but the nausea, dizziness, and limb stiffness were slowly improving. (*Id.*). She

endorsed arthralgias, myalgias, and headaches. (Tr. 385). Ms. Marvich indicated pain to light palpation in most joints, most pronounced in the wrists, and had good range of motion with pain. (*Id.*). The doctor assessed her with somatoform pain disorder and fibromyalgia and prescribed gabapentin. (Tr. 385-86).

On April 7, 2021, Ms. Marvich met with Payal Patel Soni, M.D., at the Headache and Facial Pain Section of the Center for Neurologic Restoration for evaluation of migraines. (Tr. 328-29). Ms. Marvich described her migraine history and endorsed a daily headache with two to three migraines a week and pain in the joints of her hands, elbows, and right knee. (Tr. 329, 332). She described her headaches as low, dull, temporal, and constant. (Tr. 329). She described her migraines as "hot iron stabbing" pain in the left frontal area behind her eye, loss of vision with numbness and tingling on the left side of her face, left arm and leg numbness and heaviness, photophobia, phonophobia, osmophobia, nausea, and vomiting. (*Id.*). Her migraines last between a few hours and all day. (*Id.*). She reported staying in bed under the covers for three days a week until the migraine subsides. (*Id.*). She endorsed using Tylenol and Advil daily. (Tr. 333). Ms. Marvich also described sleeping for eighteen hours a day and still feeling exhausted. (Tr. 329). Dr. Soni observed squinting due to light sensitivity; physical and neurological examination was otherwise normal. (Tr. 332). Dr. Soni diagnosed her with chronic migraine headache and medication overuse headache and prescribed a prednisone taper while topping Tylenol and Advil use, almotriptan malate to take during a migraine no more than two times a week, and protriptyline to prevent migraines. (Tr. 333).

On April 9, 2021, Ms. Marvich received a prescription for trazodone and her doctor increased her dose of gabapentin. (Tr. 564).

On April 20, 2021, Ms. Marvich returned to Dr. D'Souza's office for evaluation of fibromyalgia and shooting back pain. (Tr. 553). When she reached the examination room, she experienced an upper back spasm, during which Dr. D'Souza noted her increased pulse and instructed her to take deep breaths. (Tr. 555). The spasm subsided in 5 to 10 minutes. (*Id.*). She reported the increased nighttime dosage of gabapentin improved muscle spasms and pain, but she continued to experience those symptoms throughout the day. (Tr. 553). She also reported trazodone helped her sleep for 3-4 hours a night. (*Id.*). Ms. Marvich endorsed fatigue, headaches, and myalgias. (Tr. 555). Dr. D'Souza increased her prescription for gabapentin to twice daily, increased her dose of trazodone, and referred her to physical therapy. (Tr. 556).

On April 23, 2021, bilateral hand and wrist ultrasounds showed no active synovitis or tenosynovitis. (Tr. 516).

On April 27, 2021, Ms. Marvich sought treatment for a hump on the back of her neck and swelling to the anterior neck above her clavicles that started a few days ago. (Tr. 552). She reported her neck felt stiff and described the swelling as less in the morning and worse at the end of the day. (Tr. 548). On physical examination, the doctor noted spongy swelling in the upper back with fullness tracking to the bilateral clavicles. (Tr. 552). The doctor ordered cortisol testing to rule out Cushing syndrome, ordered a CT scan to evaluate soft tissue in the neck, and prescribed prednisone. (*Id.*).

On April 28, 2021, Ms. Marvich attended an initial evaluation for physical therapy to assess and address issues related to rheumatoid arthritis and fibromyalgia. (Tr. 544-45). On examination, Ms. Marvich reported pain with light palpation over the lower trunk, right knee, and right upper trapezius and scapular region. (Tr. 545). The physical therapist observed postural

10

guarding and pain behaviors with all movements. (*Id.*). Range of motion testing revealed limitations in both knees and hips with pain on the right, the cervical spine, and the lumbar spine. (Tr. 545-46). Strength testing revealed diminished strength in the legs, scapular-thoracic region, and the core. (Tr. 546). She was scheduled for water therapy. (Tr. 548).

Ms. Marvich returned for water therapy on April 29, May 5, 10, 12, 17, 24, and 26, and June 7 and 9, 2021. (Tr. 542-44, 595-605 611-14). Except on May 24, the physical therapist noted Ms. Marvich's tolerance for physical activity was limited by fatigue and pain. (*Id.*).

On May 3, 2021, Ms. Marvich met with her family physician for continued neck swelling, right knee pain, and unexpected weight gain. (Tr. 616). She wore a knee brace and indicated feeling unsteady without it. (*Id.*). She endorsed abdominal distention, arthralgias, joint swelling in the right knee, and myalgias. (Tr. 618). On examination, the doctor noted muscular tenderness and edema of the neck and mildly decreased range of motion, tenderness, and swelling of the right knee. (Tr. 619). The doctor prescribed diclofenac sodium gel for topical use. (*Id.*).

On May 6, 2021, Ms. Marvich met with psychiatrist Steven King, M.D., for anxiety, depression, sleep disturbances, and complications of medical problems exacerbating her anxiety and depression. (Tr. 660). There, Ms. Marvich reported medication compliance and intact self-care skills but endorsed impaired domestic tasks, social isolation, and fair sleep that is neither continuous nor completely restful. (*Id.*). Dr. King noted Ms. Marvich appeared downcast, friendly, attentive, communicative, casually groomed, overweight, and tense. (*Id.*). He observed no indicators of a psychotic process and found her cognitive functioning and short- and long-term memory intact. (*Id.*). Judgment and insight were fair, and Ms. Marvich did not display signs of hyperactive or attentional difficulties. (*Id.*). Dr. King diagnosed Ms. Marvich with major depressive

11

disorder, prescribed temazepam and Lamictal, and advised her to stop taking trazodone due to interactions with protriptyline. (Tr. 661).

On May 11, 2021, Ms. Marvich returned to her family physician's office and reported neck and shoulder pain, bilateral and radiating from the neck to the scapular area. (Tr. 606). She described three weeks of painless soft tissue swelling at the base of her neck and complained of mild to moderate pain in the right medial scapular region aggravated by pushing. (Tr. 606-07). The doctor noted a soft, mobile lump at the base of the back of her neck, some painless swelling on the right side of the neck, and a mild-to-moderate tender points in the bilateral upper scapula. (Tr. 609). Because the CT scan was normal, the doctor felt the neck lump was a lipoma. (*Id.*). He recommended stretching exercises and tennis ball massage to address tender points. (*Id.* at Tr. 609, Tr. 611).

On May 14, 2021, Ms. Marvich presented at a telehealth session with Elizabeth Kirchner, A.P.R.N., C.N.P., for evaluation of pre-rheumatoid arthritis. (Tr. 642). She endorsed recent weight gain, nosebleeds and dry mouth, heartburn, arthralgias, myalgias, muscle weakness, joint swelling, morning joint stiffness, pain and swelling in the right knee, headaches, numbness, memory loss, eye pain with redness and dryness, swollen glands under her clavicles, and a pins-and-needles sensation that starts in her hands and spreads up her arms. (Tr. 643-44). The pins-and-needles sensation occurs sporadically, lasts between a few minutes to a few hours, and is more likely to occur when she uses her hands, especially to grip. (Tr. 643). Physical examination was normal, but NP Kirchner noted photos Ms. Marvich provided showing visible neck and ankle swelling. (Tr. 644). NP Kirchner assessed Ms. Marvich with a positive rheumatoid factor and inflammatory arthritis and prescribed hydroxychloroquine. (*Id.*).

On May 20, 2021, Ms. Marvich presented at a telehealth session with Dr. King and reported sleeping better but still feeling depressed and hopeless. (Tr. 662). She also endorsed lacking energy and motivation. (*Id.*). Dr. King advised Ms. Marvich to take Lamictal twice a day. (Tr. 663).

On May 21, 2021, Ms. Marvich informed Dr. King that she was sleeping better but continued to feel depressed and hopeless and lacked energy and motivation. (Tr. 665). At Dr. King's request, Dr. Patel approved switching prescriptions from protriptyline to another anti-depressant to better target Ms. Marvich's mood. (Tr. 642). Dr. King advised Ms. Marvich to taper off protriptyline and prescribed Zoloft. (Tr. 666).

On June 4, 2021, Ms. Marvich returned to Dr. King's office and reported continued better sleep but also an increase in headache frequency since tapering off protriptyline. (Tr. 668). Ms. Marvich also asked when she could start taking hydroxychloroquine. (*Id.*). Dr. King discussed the potential for interaction between hydroxychloroquine and Zoloft, including cardiac issues. (Tr. 669).

On June 11, 2021, Ms. Marvich presented at a telehealth session with Dr. Patel for evaluation of her migraines. (Tr. 639). She reported that while on protriptyline, she did not have daily headaches and just 5 to 6 migraines per month, but that her psychiatrist switched her prescription to Zoloft for better mood control. (*Id.*). Due to its interactions with Zoloft, Ms. Marvich could not start taking hydroxychloroquine for inflammatory arthritis. (Tr. 640). After switching to Zoloft, Ms. Marvich reverted back to her daily headache pattern. (Tr. 641). She reported frequent use of almotriptan malate as a rescue medication for headaches. (Tr. 640). Otherwise, she endorsed taking gabapentin for musculoskeletal pain, Lamictal for mood,

temazepam for sleep, and Zofran for migraine-related nausea and vomiting. (*Id.*). Citing her previous improvement with protriptyline, Dr. Patel re-prescribed the medication in addition to Zoloft. (Tr. 641).

On June 18, 2021, Ms. Marvich met with Dr. D'Souza for follow up regarding fibromyalgia. (Tr. 590). There, she reported gabapentin continued to improve her nighttime muscle spasms and pain, but she also continued to feel similar symptoms throughout the day. (Tr. 591). She endorsed fatigue and myalgias. (Tr. 593). Ms. Marvich requested another referral for physical therapy and water aerobics, indicating she feels a difference with that treatment. (Tr. 591). On July 6, 2021, Dr. D'Souza increased the frequency of gabapentin to three times a day. (Tr. 589).

On July 30, 2021, Ms. Marvich met with Dr. King and complained of continued mood swings, low energy, and a lack of concentration. (Tr. 670). Ms. Marvich reported stopping Zoloft, resuming protriptyline, continuing to take trazodone, and starting hydroxychloroquine. (*Id.*). Dr. King refilled Ms. Marvich's prescription for Zoloft and advised her to stop taking trazodone and increase her doses of temazepam and Lamictal. (Tr. 671).

On August 6, 2021, Ms. Marvich met with Kaitlyn Gasser, PA-C, at the Rheumatology Clinic for evaluation. (Tr. 633-34). Ms. Marvich reported initial swelling in her joints that has since spread throughout her body and described visible swelling in her neck, shoulders, face, and chest. (Tr. 634). Face swelling occurs with "significant severe congestion at times" and she frequently has bloody discharge from her nose. (*Id.*).When her face swells everything is puffy and "it feels difficult to breathe." (*Id.*). Ms. Marvich noted the puffiness is not associated with pain. (*Id.*). She also described radiating chest wall pain, painful hands, right knee pain, and shoulder and

back pain with spasm and twitching. (*Id.*). Otherwise, Ms. Marvich endorsed weight gain despite a depressed appetite, nosebleeds, trouble swallowing, dry mouth, shortness of breath, heartburn, abdominal pain and constipation, arthralgias, myalgias, muscle weakness, joint swelling, morning joint stiffness, headaches, numbness, memory loss, eye redness, chest pain, leg swelling, and swollen glands. (Tr. 634-35). She informed PA Gasser of her prescription for hydroxychloroquine and denied any benefit from the medication. (Tr. 638).

PA Gasser did not observe periorbital edema during the office visit but observed full face swelling and nose swelling in photos. (Tr. 637). Otherwise, physical examination revealed tenderness to palpation of the neck, finger joints, wrists, elbows, shoulders, feet, ankles, knees, and sacroiliac joints. (*Id.*). Ms. Marvich had diffuse paraspinal and vertebral tenderness throughout the cervical, thoracic, and lumbar spine, and PA Gasser identified muscle spasms in the neck with palpation. (*Id.*). PA Gasser assessed Ms. Marvich with inflammatory arthritis and fibromyalgia. (Tr. 638). She had low suspicion for systemic inflammatory/pre-rheumatoid arthritis and suspected Ms. Marvich's chest pain was costochondritis or fibromyalgia. (*Id.*).

On August 24, 2021, Ms. Marvich met with Dr. D'Souza for follow up regarding fibromyalgia. (Tr. 584). She indicated the increased dose and frequency of gabapentin is helpful but has not taken it consistently due to issues with the pharmacy. (Tr. 588). Physical examination was normal. (Tr. 587). At Ms. Marvich's request, Dr. D'Souza referred her for more physical therapy. (*Id.*).

On September 16, 2021, Ms. Marvich presented at a telehealth session with nurse practitioner Betty Stiffler, A.P.R.N., C.N.P., for evaluation of headaches. (Tr. 630-31). Ms. Marvich informed NP Stiffler that her insurance company no longer covers protriptyline and Zoloft caused

electric shocks in her spine that ceased when she stopped taking it. (Tr. 631). NP Stiffler prescribed amitriptyline to replace protriptyline and suggested Botox injections in the future. (Tr. 633).

A chest X-ray dated September 27, 2021, was largely unremarkable except minimal bilateral apical pleural scarring. (Tr. 714).

On October 1, 2021, Ms. Marvich met with Dr. King and reported ongoing depression and mood instability, anxiety, and marked difficulty with focus and concentration. (Tr. 672). She also reported the change from protriptyline to amitriptyline. (*Id*.). Dr. King prescribed Buspar for anxiety and advised Ms. Marvich to increase her dose of Lamictal. (Tr. 673).

On October 6, 2021, Ms. Marvich presented at a telehealth session with pulmonologist Timothy Lumpkin, M.D., for evaluation of apical scarring. (Tr. 709). She described her history, including original symptoms of fatigue and joint pain/stiffness, and the presence of new symptoms, including shortness of breath with exertion and associated tingling in the arms and hands, chest pain that burns when touched, and swelling of the chest and neck. (*Id*.). She noted heat worsens her symptoms and endorsed weight gain, a rash around the neck, chronic migraines, nausea, joint pain, anxiety with dyspnea, and headaches. (*Id*.). Dr. Lumpkin suspected Ms. Marvich's symptoms were musculoskeletal and not pulmonary in nature, but ordered a chest CT scan and pulmonary function testing given the results of the chest X-ray and elevated rheumatoid factor. (Tr. 710).

On November 15, 2021, Ms. Marvich met with Dr. King and reported moderate to severe anxiety, irritability, poor stress tolerance, and hypervigilance. (Tr. 782). She denied medication side effects. (*Id*.). Dr. King refilled prescriptions for temazepam, Lamictal, and buspirone. (Tr. 783).

Ms. Marvich returned to Dr. King's office on November 29, 2021, and continued to complain of anxiety, depression, and trouble sleeping. (Tr. 784). Dr. King recommended adding Rexulti at bedtime. (Tr. 785).

On December 13, 2021, Ms. Marvich presented at a telehealth session with NP Stiffler for a follow-up visit concerning her headaches. (Tr. 705-06). She reported continued daily headaches and insomnia. (Tr. 708). NP Stiffler advised Ms. Marvich to increase her dose of amitriptyline and prescribed Rexulti. (*Id.*).

That same day, Ms. Marvich also met with Dr. D'Souza and reported muscle spasms all over her body, intermittent rashes on her neck and scalp, and redness on her cheeks. (Tr. 686). Ms. Marvich reported not taking gabapentin because she did not want to be on so many medications. (*Id.*). She stated physical therapy was helpful at times, but not during her flare ups. (*Id.*). Physical examination revealed a rash at the base of her neck and the presence of multiple tender points but was otherwise normal. (Tr. 689). Dr. D'Souza decided to wait until Ms. Marvich met with her rheumatologist before changing her treatment. (*Id.*).

On December 20, 2021, Ms. Marvich met with Dr. King and reported disturbed sleep with early morning awakening. (Tr. 786). Dr. King recommended increasing her dose of Rexulti. (Tr. 787).

On December 22, 2021, Ms. Marvich met with rheumatologist Ahmed Elghawy, D.O., for evaluation of joint pain. (Tr. 739). There, she complained of pain in both knees, right hip, and both feet, and endorsed some difficulty with getting herself dressed, getting in and out of bed, walking outdoors, washing and drying herself, and entering and exiting a car. (Tr. 740). She endorsed fever, weight change, nosebleeds, trouble swallowing, dry mouth, cough, shortness of

breath, pain with breathing, diarrhea, arthralgias, myalgias, muscle weakness, joint swelling, morning joint stiffness, headaches, numbness, memory loss, rash, hair loss, redness and dryness of the eyes, chest pain, leg swelling, and swollen glands. (*Id.*). Hand and wrist X-rays did not reveal evidence of inflammatory arthropathy. (Tr. 743). Physical examination was largely normal except diffuse tenderness along the entirety of the hands and wrists and tenderness to palpation of the right greater trochanter with radiation into the gluteal fossa. (Tr. 743-44). Dr. Elghawy felt Ms. Marvich's symptoms appeared more consistent with fibromyalgia, referred her back to her family physician for management, and recommended Lyrica for treatment. (Tr. 744). He suggested physical therapy for right gluteus medius tendinopathy and stopping hydroxychloroquine for lack of efficacy if her pain level remained high. (*Id.*). For poor sleep, Dr. Elghawy ordered a polysomnogram. (*Id.*).

On January 18, 2022, Ms. Marvich returned to Dr. King's office and reported ongoing sleep disturbance and the inability to focus and concentrate. (Tr. 789). Dr. King did not change Ms. Marvich's medication but advised her to continue counseling. (Tr. 790).

On January 21, 2022, Ms. Marvich attended a pain management consultation for fibromyalgia with Riad Laham, M.D., and reported generalized body pain and generalized numbness in her upper extremities. (Tr. 735). She endorsed neck and shoulder pain with finger numbness, pain in the thoracic and lumbar spine that travels into the hips and down into her toes, and joint pain described as continuous, sharp, tingling, numbness, burning, and stabbing pain. (*Id.*). Her symptoms interfere with her physical activity, work, walking, sleeping, sitting, bathing, cooking, cleaning, reaching, lifting, and social activities. (*Id.*). Dr. Laham advised Ms. Marvich to

wean off gabapentin, prescribed Lyrica, and prescribed Effexor to take in the event Ms. Marvich stabilized on Lyrica but continued to have unresolved symptoms. (*Id.*).

On March 1, 2022, Ms. Marvich returned to Dr. King's office and complained of persistent ADHD symptoms and trouble sleeping. (Tr. 791). She reported temazepam does not help her sleep, but she gets modest benefit from her anti-anxiety and anti-depression medications. (*Id.*). Dr. King advised Ms. Marvich to stop taking temazepam and prescribed Belsomra for sleep. (Tr. 792).

On March 14, 2022, Ms. Marvich presented at a telehealth session with Kristin Baugh, PA-C, of the Headache Clinic and reported involuntary lip and mouth movements and daily headaches that are initially dull and increase in severity as the day progresses. (Tr. 729-30). PA Baugh prescribed Ubrelvy and advised Ms. Marvich to take cyproheptadine for migraine rescue until her insurance company determines coverage for Ubrelvy. (Tr. 733). PA Baugh also suggested Ms. Marvich take one-third of her total dose of amitriptyline and the rest at bedtime to reduce evening migraines. (*Id.*).

On March 18, 2022, Ms. Marvich met with Dr. King and reported trouble sleeping, continued anxiety and depression, and facial muscle twitches. (Tr. 794). Noting Belsomra was approved by Ms. Marvich's insurance, Dr. King advised Ms. Marvich to begin Belsomra and decrease Rexulti. (Tr. 795).

On April 8, 2022, Ms. Marvich returned to Dr. King's office and reported being unable to work due to functional impairment from her mental health and medical issues and described her concentration problems and mood instability as "significant." (Tr. 796). She stated she stopped

19

Rexulti due to abnormal mouth movements and had not taken hydroxychloroquine for two weeks. (*Id.*). Dr. King advised her to stop Rexulti and increased her prescription for Lamictal. (Tr. 797).

On April 28, 2022, Ms. Marvich sent a message to NP Stiffler about continued facial tremors and jaw chattering despite stopping Rexulti. (Tr. 802). She also described an instance of vertigo accompanied by a loss of motor control and convulsions. (*Id.*). NP Stiffler placed a referral for the epilepsy department and advised Ms. Marvich to go to the emergency department if the symptoms reoccur. (*Id.*).

## IV.  Medical Opinions

On June 23, 2021, Ms. Marvich attended a consultative psychological evaluation at the behest of the Social Security Administration. (Tr. 566-70). The SSA did not provide any records for the consultative examiner's review. (Tr. 566). Evelyn Rivera, Ph.D., performed the evaluation and based her opinions on the clinical interview. (*Id.*). Ms. Marvich reported she cannot work because she suffers from rheumatoid and psoriatic arthritis that causes constant inflammation in her body, fibromyalgia, and migraines that cause facial numbness, blurry vision, vertigo, and left eye pain. (Tr. 566-67). Ms. Marvich also reported suffering from worsened anxiety and depression since her autoimmune diagnoses in December 2020. (Tr. 567). She often feels worthless, has trouble focusing her attention and forgets things easily, and gets anxious talking to others. (*Id.*).

Dr. Rivera noted Ms. Marvich appeared depressed with low energy but did not display any overt symptoms of anxiety during the interview. (*Id.*). She reported forgetting things and not being able to "keep numbers in her head like she used to." (Tr. 568). Ms. Marvich had some difficulty with serial seven subtraction from 100 — she subtracted slowly and appeared to lose her focus

doing the task – and misspelled "world" backwards, but otherwise appeared to function at an

average intellectual level based on her verbal abilities. (*Id.*).

Dr. Rivera provided the following functional assessment:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions:**

The claimant was able to understand the examiner's questions at the interview. She did appear to lose her focus while doing the serial seven subtraction. The claimant reported that she was very good with math prior to becoming ill and that now she is having difficulty focusing and keeping the numbers in her head.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks:**

The claimant was able to focus her attention at the interview for the most part. She did appear to have difficulty focusing her attention while doing the serial seven subtraction task. She subtracted slowly. The claimant reported that she has been forgetting things and having difficulty focusing her attention.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting:**

The claimant's depressed mood, low energy, anxiety symptoms, social anxiety and agoraphobic symptoms, low stress tolerance, difficulty focusing her attention, memory difficulties as well as her limited coping skills will affect her ability to respond appropriately to supervision/co-workers in a work setting.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting:**

The claimant's depressed mood, low energy, anxiety symptoms, social anxiety and agoraphobic symptoms, difficulty focusing her attention, memory difficulties, low stress tolerance and her limited coping skills will affect her ability to respond appropriately to work pressures in a work setting.

(Tr. 569-70).

On June 28, 2021, State agency medical consultant W. Scott Bolz, M.D., reviewed Ms.

Marvich's medical records and determined she can occasionally climb ramps and stairs, but never

climb ladders, ropes, or scaffolds; must avoid concentrated exposure to noise; and must avoid all exposure to hazards including heights, dangerous machinery, and commercial driving. (Tr. 102-03). Dr. Bolz also evaluated Ms. Marvich's symptoms and determined that her allegations regarding anxiety and being unable to do anything were not supported by or consistent with the evidence, but her allegations of migraines/headaches and mental functional limitations related to her depression are supported. (Tr. 101). On January 1, 2022, State agency medical consultant Dimitri Teague, M.D., reviewed updated medical records and affirmed Dr. Bolz's functional assessment. (Tr. 123-24).

On July 19, 2021, State agency psychological consultant Audrey Todd, Ph.D., reviewed Ms. Marvich's psychiatric records and determined she was moderately limited in her abilities to carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. (Tr. 112). Dr. Todd determined she can:

> carry out occasional moderately complex tasks. Interaction between somatic and psychological conditions does impact ability to maintain regular attendance, but absences due to mental health conditions are not expected to be excessive. She would also require occasional extra breaks or experience occasional slowed pace. She is able to sustain tasks that do not require strict production quotas.
>
> * * *
>
> Reduced coping skills/abilities due to her conditions. She can adapt to minor occasional changes in workplace procedures, etc.

(Tr. 112-13). Dr. Todd further explained "[a]lthough there is some overlap between her somatic symptoms and mental health functioning, her ability to deal with her physical issues is compromised by her mental health conditions, which contributes to her mental functional limitations." (Tr. 113). On December 27, 2021, State agency psychological consultant Cynthia Waggoner, Psy.D., reviewed updated medical records and affirmed Dr. Todd's functional assessment. (Tr. 125).

## V.    Other Evidence

On April 26, 2021, Ms. Marvich completed an Adult Function Report detailing how her conditions affect her ability to function. (Tr. 281-88). At the time, she and her son lived with her boyfriend. (Tr. 281). She endorsed constant pain and exhaustion, debilitating chronic migraines, shaking and tingling hands, and irritation and anxiety, all of which limit her daily activities. (*Id.*). She takes care of her child's basic needs and ensures he does his schoolwork. (Tr. 282). Her boyfriend helps her with caring for a cat and a dog. (*Id.*). She used to make three meals a day but now orders in and cooks a simple meal about once a month. (Tr. 283). She has groceries delivered weekly. (Tr. 284).

When she has the energy, Ms. Marvich can complete one household task but is wiped out for the rest of the day. (Tr. 282). Laundry takes days to complete because walking up and down the stairs hurts her knees and tires her out. (*Id.*). Even when she has the energy to do more, she struggles with motivation. (*Id.*). Ms. Marvich enjoys reading, crafting, and riding horses but is limited in all those activities. (Tr. 285). She has difficulty reading due to focus issues, cannot ride horses anymore due to pain and exhaustion, and crafting is limited due to pain. (*Id.*). She used to

23

go for walks, visit friends, and visit her parents' house at least weekly, but now she does not leave the house except to attend medical appointments. (*Id.*).

Because of her conditions, Ms. Marvich struggles with lifting, squatting, bending, standing, walking, sitting, kneeling, talking, stair climbing, memory, task completion, concentration, understanding, following instructions, and using her hands. (Tr. 286). She can walk about 20 minutes before needing to rest for about 10 minutes. (*Id.*). Her ability to pay attention is dependent on her pain level. (*Id.*). She does not handle stress well and changes in routine make her anxious. (Tr. 287). She experiences instances of hysterical crying and hyperventilating. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet or medically equal one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

24

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

The ALJ issued an unfavorable decision on June 28, 2022. (Tr. 12-34). At Step One, the ALJ determined Ms. Marvich meets the insured status requirements of the Social Security Act through December 31, 2026 and has not engaged in substantial gainful activity since December 29, 2020, the alleged onset date. (Tr. 18). At Step Two, he determined Ms. Marvich has severe impairments of migraine headaches, fibromyalgia, and major depressive disorder. (*Id.*). At Step Three, the ALJ determined Ms. Marvich does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (*Id.*). The ALJ reviewed Ms. Marvich's medical records, hearing testimony, and medical opinions to conclude she remains capable of light work with additional limitations including:

occasionally climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid all exposure to more than moderate noise levels, unprotected heights, moving mechanical parts and commercial driving; the claimant is limited to the performance of simple, routine, repetitive tasks and to the making

25

of no more than simple, work-related decision, conducted in a work setting free of production rate pace.

(Tr. 20). At Step Four, the ALJ determined Ms. Marvich could not perform her past relevant work.

(Tr. 27). At Step Five, he determined jobs exist in significant numbers in the national economy

that Ms. Marvich can perform and concluded she was not disabled. (Tr. 28).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Ms. Marvich raises two issues for review. First, she argues the ALJ's Step Three determination is not supported by substantial evidence. (ECF #11 at PageID 844, 848). She takes

issue with the ALJ's conclusion that he could not find her conditions medically equaled any listing because there was no medical expert testimony supporting medical equivalency. (*Id.* at PageID 844, 848) (referring to Tr. 19) ("Relevant to listing 11.02 and 14.09, there was no independent medical expert at the hearing, without testimony from which, the undersigned is constrained from making an 'equals' finding."). Ms. Marvich also claims the ALJ did not consider her migraine headaches throughout the sequential evaluation. (ECF #11 at PageID 847). In response, the Commissioner asserts the ALJ's declining to find medical equivalency is appropriate because the record does not contain "the requisite medical opinion evidence to establish medical equivalency," and the decision as a whole supports the ALJ's conclusion at Step Three. (ECF #12 at PageID 866).

Next, Ms. Marvich argues the ALJ's RFC is not supported by substantial evidence because he did not consider her complaints of fatigue. (ECF #11 at PageID 849-50). The Commissioner appears to acknowledge the ALJ did not mention Ms. Marvich's repeated complaints of fatigue and exhaustion (*see* ECF #12 at PageID 872) ("Admittedly, the ALJ's evaluation would have benefited from greater verbiage and more specific citations to case law.") but notes an ALJ's findings regarding symptom evaluation "are virtually unchallengeable" and asserts the ALJ here "observed his obligations to consider [her] subjective complaints." (ECF #12 at PageID 869).

A.      **The ALJ did not properly evaluate whether Ms. Marvich's migraines and headaches medically equaled a listed impairment.**

At Step Three, the ALJ must determine whether the claimant's medically determinable impairment meets or equals a listed impairment. A claimant is conclusively disabled and entitled to benefits if the claimant's impairment or combination of impairments meets or equals a listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of a listed

impairment. 20 C.F.R. §§ 404.1526(a), 416.926(a). Pertinent to Ms. Marvich's argument, one way medical equivalency can be found is by comparing the claimant's impairment with a closely analogous listed impairment. 20 C.F.R. §§ 404.1526(b)(2), 416.926(b)(2).

The ALJ must consider all evidence in the case record about the impairments and their effects on the claimant that is relevant to the finding of medical equivalence. 20 C.F.R. § 404.1526(c). In addition, the ALJ must actually evaluate the evidence, compare it to the listing, and give an explained conclusion that facilitates judicial review, *see Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). There is no error if the ALJ does not make specific findings at Step Three so long as the ALJ makes sufficient factual findings elsewhere in the decision that support the ALJ's Step Three conclusions. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014). And, even if the ALJ does not make sufficient factual findings elsewhere in the decision, any error is harmless where the claimant has not shown her impairments met or medically equaled a listed impairment. *Id.* The claimant bears the burden of establishing that claimed impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). "A claimant can demonstrate that []he is disabled because h[is] impairments are equivalent to a listed impairment by presenting 'medical findings equal in severity to all the criteria for the one most similar listed impairment.'" *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)).

To make a finding of medical equivalence, the record *must* contain one of the following:

1.  A prior administrative medical finding from a medical or psychiatric consultant from the initial or reconsideration adjudication levels supporting the medical equivalence finding; or

2.     Medical expert evidence, which may include testimony or written response to interrogatories, obtained at the hearing level supporting the medical equivalence finding; or

3.     A report from the Appeals Council's medical support staff supporting the medical equivalence finding.

SSR 17-2p at *3. Regarding articulation requirements, SSR 17-2p explains:

An [ALJ] must provide a rationale for a finding of medical equivalence in a decision that is sufficient for a subsequent reviewer or court to understand the decision. Generally, this will entail the [ALJ] identifying the specific listing section involved, articulating how the record does not meet the requirements of the listed impairment(s), and how the record, including ME or medical support staff evidence, establishes an impairment of equivalent severity.

Similarly, an [ALJ] must consider all evidence in making a finding that an individual's impairment(s) does not medically equal a listing. If an [ALJ] believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the [ALJ] is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An [ALJ's] articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

*Id.* at *4. Thus, an "ALJ is not required to obtain medical expert evidence regarding equivalence if . . . the ALJ 'believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment[.]'" *Holmes v. Comm'r of Soc. Sec.*, No. 1:17-cv-1648, 2018 WL 3544902, at *3 (N.D. Ohio July 24, 2018).

Migraines are not a listed impairment but guidance from the Social Security Administration directs ALJs to compare primary headache disorders with paragraphs B and D of Listing 11.02 to determine medical equivalency. *See* SSR 19-4p, 2019 WL 4169635, at *7. According to SSR 19-4p, an ALJ evaluates a primary headache disorder as follows:

Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.*

Here, at Step Three, the ALJ determined Ms. Marvich "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (Tr. 18). So long as the ALJ's articulation of the reasons why the individual is not disabled at a later step in the sequential evaluation provides rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at Step Three, the ALJ's cursory articulation at Step Three is not error. The ALJ evaluated Ms. Marvich's migraine headaches as follows:

In terms of the claimant's alleged migraine headaches, she was diagnosed with migraine headaches on December 21, 2020. While this finding would be consistent with the claimant's allegations of chronic headaches, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

Diagnostic imaging of the claimant's brain, dated December 29, 2020, was unremarkable.

The claimant has made use of various regimens of prescription medications intended to address this impairment. Their use has been stopped because of side effects, cost, and, at last report, because it had recently stopped working. However, the combination of "Elavil" and "Tegretol" reduced her headaches to a total of two or

three between December 2020 and February 2021. Use of "Protriptyline" reduced her headache from daily to six per month until September 2021, when it was exchanged for "Amitriptyline" because of the cost. At last report, the claimant was to continue Amitriptyline and cyproheptadine while waiting to see if "Ubrelvy" would be covered.

The claimant had been apprised of the availability of "Botox" injections, but as of the close of the evidence, these had not been attempted.

The claimant has required no emergency room visits to treat for migraine headaches.

Clinical examinations included in the record have consistently, albeit, not universally, reported either mildly adverse, or benign findings, including one dated March 24, 2021, which indicated normal cranial nerves II-XII, one dated September 26, 2021 which indicated that the claimant presented as alert and oriented, answering questions with appropriate eye contact and without pain behaviors, and with cranial nerves II, III, IV, VI and VII intact [this was a video examination], or one dated March 14, 2022, another video examination, but which was an "essentially normal" neurological examination.

* * *

The record shows a claimant with migraine headaches, but susceptible to considerable improvement with, to date, two different regimens of medications. [referring to Tr. 329 (amitriptyline and carbamazepine), Tr. 631 (protriptyline and Zoloft)].

(Tr. 22-23, 25) (citations omitted). Several issues in the ALJ's summation of the medical evidence preclude me from finding the rationale sufficient to explain the ALJ's basis for finding no medical equivalence at Step Three.

First, although the ALJ noted the treatment regimen often changed due to side effects, cost, and inefficacy (Tr. 22), he determined that improvement with a combination of amitriptyline and carbamazepine and the combination of protriptyline and Zoloft was consistent with his conclusion that Ms. Marvich's migraines and headaches did not preclude all work. (Tr. 25). It is not clear from the written decision, but the first combination of medications caused Ms. Marvich to sleep for 12 to 16 hours a day and caused dizziness, vestibulopathy, fatigue, and cognitive issues;

in addition, evidence suggests amitriptyline on its own was significantly less effective for treating her migraines and headaches. (Tr. 343, 398, 729-30). Regarding the second combination of medications, Ms. Marvich's insurance company stopped covering one drug and the other caused side effects. (Tr. 630-31). The ALJ has not explained how past improvement with two combinations of medications that Ms. Marvich no longer takes suggests she is not disabled, without which this Court cannot trace any logical path between the evidence and the conclusion. *See Fleischer*, 774 F. Supp. 2d at 877 (concluding a district court cannot uphold an ALJ's decision, even if there is enough evidence in the record to support the decision, where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result).

Next, the ALJ is tasked with considering all the evidence when making a determination of medical equivalence to a listing, SSR 17-2p, at *4, including the pertinent information identified in SSR 19-4p: description of a typical headache and associated phenomena, frequency, adherence to treatment, side effects of treatment, and limitations in functioning. SSR 19-4p, at *7. The ALJ's summation omits the many descriptions of Ms. Marvich's typical headaches and migraines, associated symptoms, and functional limitations, including the following:

- Migraines are described as sharp and stabbing pain behind the left eye, pressure and throbbing sensation; associated with left-sided facial numbness, droop, vertigo, nausea, photophobia, and phonophobia. (Tr. 406) (Dec. 21, 2020; migraine headaches evaluation).

- The combination of amitriptyline and carbamazepine caused adverse side effects, including dizziness, vestibulopathy, fatigue, and cognitive issues. When taking them, Ms. Marvich slept 12 to 16 hours a day. Dr. Bednar discontinued these prescriptions. (Tr. 398) (Feb. 5, 2021; migraine headache evaluation) (Tr. 343) (Mar. 2, 2021; evaluation for multiple symptoms).

- Headaches occur throughout the day, vary in intensity, are often accompanied by nausea and vomiting. (Tr. 393) (Mar. 22, 2021; evaluation to establish care with PCP).

33

- Beginning in November or December 2020, daily persistent headaches, three to five migraines a week. Doing fairly well in January and February 2021, experiencing mild, tolerable headaches while on amitriptyline and carbamazepine. Migraines and headaches resumed in March 2021 when Dr. Bednar stopped her medications. Migraine-associated pain and numbness in face, hands. (Tr. 334-35) (Mar. 24, 2021; evaluation at Neuromuscular Center).

- Daily headaches, migraines two to three times a week. Headaches are low, dull, temporal, and constant. Migraines are "hot iron stabbing" pain in the left frontal area behind her eye, loss of vision with numbness and tingling on the left side of her face, photophobia, phonophobia, osmophobia, nausea, and vomiting. Migraines last between a few hours and all day. She reported staying in bed under the covers for three days a week until the migraine subsides. She endorsed using Tylenol and Advil daily. (Tr. 329, 333) (Apr. 7, 2021; Headache & Facial Pain Section, evaluation).

- With protriptyline, no daily headaches and just five to six migraines each month, With Zoloft, reverted back to daily headache pattern and frequent use of almotriptan malate as a rescue medication for headaches. (Tr. 639-40) (June 11, 2021, evaluation migraines).

- Ms. Marvich's insurance stopped covering her prescription for protriptyline. She received amitriptyline as a replacement. She stopped taking Zoloft because it caused electric-like shocks up her spine. (Tr. 630-33) (Sept. 16, 2021; headache evaluation).

- Daily headaches, described as initially dull and increasing in severity, despite use of amitriptyline. The nurse practitioner increased the dose and prescribed Rexulti. (Tr. 708) (Dec. 13, 2021; headache evaluation).

- Daily headaches, described as initially dull and increasing in severity, despite increased dose of amitriptyline and addition of Rexulti. The physician's assistance advised Ms. Marvich to change the times she takes amitriptyline, discontinued Rexulti, and prescribed two new medications. (Tr. 729-30) (Mar. 14, 2022 for evaluation).

The ALJ appears to have accepted that Ms. Marvich suffers from migraines and headaches but dismissed much of the evidence pertinent to the ALJ's consideration of medical equivalence under SSR 19-4p, including most of her headache descriptions, associated symptoms, and limitations in functioning, except sensitivity to noise (Tr. 25), without explanation for his rejection

of the evidence. Failure to consider the record as a whole undermines the ALJ's conclusions. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985). While the "ALJ need not discuss every piece of evidence in the record for [his] decision to stand," *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 656 (6th Cir. 2004), he must provide a discussion at each step of the sequential evaluation "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.*, 3:16cv2368, 2017 WL 3405700, at *7 (N.D. Ohio June 30, 2017) (quotation omitted), *report and recommendation adopted*, 2017 WL 3394756 (N.D. Ohio Aug. 8, 2017); *see also Orick v. Astrue*, No. 1:10-cv-871, 2012 WL 511324, at *5 (S.D. Ohio Feb. 15, 2012) (holding the ALJ must discuss relevant evidence and "articulate with specificity the reasons for the findings and conclusions" he makes). "[W]hen the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Morris v. Sec'y of Health & Human Servs.*, 845 F.2d 326, at *2 (6th Cir. 1988) (table) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cr. 1981)). "In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial only when considered in isolation. It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful review." *Hurst*, 753 F.2d at 519 (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Considering the ALJ's decision as a whole, he does not articulate reasons for rejecting evidence pertinent to Ms. Marvich's migraines and headaches that could reasonably support a finding of medical equivalence at Step Three. Without such articulation, the ALJ has failed to build a logical bridge between the evidence and his conclusions. As such, I conclude the ALJ's analysis after Step Three is not sufficient to explain the basis for his Step Three determination.

Without sufficient rationale, I cannot determine whether substantial evidence supports the ALJ's decision.

**B.**    **The ALJ's subjective symptom evaluation is not supported by substantial evidence.**

Ms. Marvich argues the ALJ ignored relevant evidence documenting her symptoms, including fatigue. (ECF #11 at PageID 850). The Commissioner claims the ALJ observed his obligation to consider Ms. Marvich's complaints. (ECF #12 at PageID 869).

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ alone determines a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

The ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304, at *1. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ considers the entire case record, including the objective medical evidence; the individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in

the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R.

§§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the individual's statements:

1. A claimant's daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See, e.g.,*

*Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not

analyze all seven factors identified in the regulation but should provide enough assessment to

assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount

subjective testimony when the ALJ finds those complaints are inconsistent with objective medical

and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ may not reject an individual's statements

about her symptoms solely because the objective medical evidence does not substantiate the degree

of impairment-related symptoms alleged but must carefully consider other evidence in the record.

*See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also* SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ must explain which of an individual's symptoms are consistent or inconsistent with the evidence and how the evaluation led to the ALJ's conclusions. *Id.* at *8. The Sixth Circuit has emphasized the importance of an ALJ's articulation in the context of fibromyalgia, stating, "given the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 863 (6th Cir. 2011) (quotation omitted). The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

In the previous section, I noted the ALJ's summation of the evidence regarding migraines and headaches did not acknowledge most of Ms. Marvich's reported symptoms, including frequent stabbing and throbbing head pain, especially behind the left eye; associated symptoms of nausea, vomiting, photophobia, osmophobia, and vision issues; and associated functional limitations, including needing to lie in bed and under the covers during a migraine. As it relates to fibromyalgia, the ALJ documented the following:

> In terms of the claimant's fibromyalgia, this was diagnosed definitively on March 26, 2021. While this finding would be consistent with the claimant's allegations of

constant pain, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

The claimant has followed a regimen of prescription medications, including the nerve conduction suppressant Gabapentin, intended to address this impairment. She has reported side effects, including drowsiness and dizziness from its use, on an inconsistent basis. She reported its use was helpful, primarily at night, but elected to stop using it in December 2021.

As medical science has long since satisfied itself that the existence of this impairment works no permanent damage to the nerves, muscles, or joints it affects, the preferred method of treatment has become increased exercise and activity. There are adjurations for such from at least two providers within the record, and in fact the claimant conceded the benefit of three months of physical therapy, between April and September 2021.

Clinical examinations in the record have, as would be expected, generally, albeit not universally, reported preserved muscle strength, including on March 24, 2021, or one dated December 22, 2021.

(Tr. 21-22). Later, the ALJ concluded Ms. Marvich's statements about her symptoms were inconsistent with the evidence of record because her activities of daily living suggest she is capable of working within the confines of the RFC and she was noted to report somatoform symptoms:

At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following activities: **the claimant is able to attend to her personal care. She is able to engage in child rearing for a child under age ten and to care for household pets. She retains household responsibilities, despite receiving some assistance. She is able to drive a car, manager her own finances, medications and an e-mail account. She spends time with others, reads, and crafts for pleasure (though less so than in past years).** In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in work activity contemplated by the residual functional capacity.

* * *

39

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the claimant has described symptoms of her conditions in such a manner as to be classified as unusual and concerning for a viral process, or as a sudden onset of symptoms without clear reason. She has been described as engaging in a "lot of somatization," or with multiple somatoform symptoms, or symptoms with significant psychological overlay, ultimately being diagnosed with somatoform pain disorder and being referred to psychiatry. This is not to suggest that the claimant engaged in a deliberate attempt to deceive or mislead. To the contrary, the Disability program expressly contemplates the potential for somatoform disorders as disabling (see, for example, section 12.07 of the Listing of Impairments). However, it must also be considered significant that the claimant has been seen, and evaluated, by at least three psychiatric providers, none of whom registered such a diagnosis.

(Tr. 24-25).

Here, the ALJ's consideration of Ms. Marvich's subjective complaints does not comport with the Social Security Administration's requirements. First, the fact that Ms. Marvich's treating providers recommended increased exercise cannot be deemed to detract from her credibility. *See Rogers*, 486 F.3d at 249 ("[T]he fact that a patient is encouraged to remain active does not reflect the manner in which such activities may aggravate the patient's symptoms."). Moreover, available evidence from therapy records suggests Ms. Marvich was observably limited by pain and fatigue during her therapy sessions. (*See* Tr. 542-44, 595-605 611-14).

Next, Ms. Marvich indeed testified she attends to her own personal care, cares for her child and household pets, does household chores, and engages in some limited hobbies. But the ALJ's description grossly mischaracterizes the available evidence. Ms. Marvich helps her child get ready for school, but she reports doing so wears her down such that she usually returns to bed for another three to four hours. (Tr. 51). She lives with her ex-spouse and his fiancé because she can no longer take care of herself. (*Id.*). She receives additional assistance from her parents. (*Id.*). On days when she feels okay, she can take the dog outside to go to the bathroom and "probably" some

minimal chore, like loading the dishwasher. (*See* Tr. 51-52) ("If I get one task done during the day, it's something."). Three to five days a week she remains in bed due to pain, migraines, or nausea. (Tr. 52). These minimal activities that she completes on, at best, an unpredictable, intermittent basis, are inconsistent with regularly performing a normal day's typical work activities. *See Rogers,* 486 F.3d at 248-49 (finding that the plaintiff's daily functions, including her ability to drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news, were not "comparable to typical work activities" and did not justify the ALJ's discrediting her testimony).

Last, the ALJ determined Ms. Marvich's statements about her symptoms are inconsistent because she reported somatic symptoms and was referred for psychiatric treatment. This represents a fundamental misapprehension of how fibromyalgia is evaluated. According to guidance offered in SSR 12-2p, somatic symptoms and signs are the very criteria on which a diagnosis of fibromyalgia is determined and are to be considered when evaluating the impairment. SSR 12-2p, 2012 WL 3104869, at *3 n.9 (noting that somatic symptoms and signs are fibromyalgia diagnostic criteria and include muscle pain, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, numbness or tingling, dizziness, insomnia, depression, nausea, nervousness, chest pain, blurred vision, vomiting, easy bruising, etc.).

In light of the foregoing, the ALJ's conclusions regarding Ms. Marvich's statements about the intensity, persistence, and limiting effects of her symptoms are not supported by substantial evidence.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I

**REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental

security income and **REMAND** for additional proceedings consistent with this opinion.

Dated: March 12, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE